UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
TEAMSTERS LOCAL 456, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, AFL-CIO,

                               Plaintiff,

           -against-

AMEC COMMERCIAL, LLC,

                               Defendant.
-------------------------------------------------------------------x

**OPINION & ORDER**

18-CV-854 (CS)

Appearances:

Brian J. LaClair
Blitman & King LLP
Syracuse, New York
*Counsel for Plaintiff*

Jaclyn G. Goldberg
Lance H. Klein
Keane & Beane, P.C.
White Plains, New York
*Counsel for Defendant*

Seibel, J.

      Before the Court, in this action filed by Plaintiff Teamsters Local 456, International Brotherhood Of Teamsters, AFL-CIO ("Union") against Defendant AMEC Commercial, LLC ("AMEC Commercial"), is Defendant's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), (Doc. 30), and Plaintiff's cross-motion to compel arbitration of a labor dispute under Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) ("LMRA § 301"), (Doc. 33). For the reasons set forth below, Plaintiff's motion is GRANTED and Defendant's motion is DENIED.

## I. BACKGROUND

### A. Facts

The following facts are taken from the pleadings, the parties' Local Rule 56.1 statements, and the declarations submitted in support of, and opposition to, the instant motions.[1]

Plaintiff is an unincorporated association existing under the laws of New York and a "labor organization" under 29 U.S.C. § 185(a). (Doc. 37-7 ("P's 56.1 Resp.") ¶¶ 3-4.)[2]

---

[1] "Courts deciding motions to compel [arbitration] apply a standard similar to that applicable for a motion for summary judgment," so "the court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and alterations omitted); *see Philippe v. Red Lobster Rests. LLC*, No. 15-CV-2080, 2015 WL 4617247, at *2 (S.D.N.Y. Aug. 3, 2015) ("It is . . . proper (and in fact necessary) to consider extrinsic evidence when faced with a motion to compel arbitration.") (internal quotation marks omitted).

[2] The order in which the parties submitted their Local Rule 56.1 statements is perplexing. Although Defendant moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) and Plaintiff filed the cross motion to compel arbitration – to which I am instructed to apply "a similar standard to that applicable for a motion for summary judgment," (*see supra* note 1) – the first Local Rule 56.1 statement of undisputed facts was filed by Defendant with its opposition to the motion to compel, and Plaintiff responded with its reply papers. Although a motion to compel is not a motion for summary judgment, and a Local Rule 56.1 statement is not required, I would have expected, if anything, that the party moving to compel arbitration (Plaintiff) would have first filed a Local Rule 56.1 statement to which the nonmovant (Defendant) would have responded. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if *the movant* shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") (emphasis added). Plaintiff's reply memorandum seems to suggest that Plaintiff only responded to Defendant's 56.1 statement because Defendant filed one and that the Court need not actually consider the parties' declarations to decide arbitrability. (Doc. 37 at 2 n.1.) For the reasons discussed in footnote 1, I will consider the parties' 56.1 statements as well as the underlying relevant, admissible evidence.

Plaintiff's responsive 56.1 statement fails to comply with item 2.C.i of the Court's individual practices, which requires the opposing party to reproduce each entry in the moving party's Rule 56.1 statement before setting out its response thereto. Plaintiff's failure to reproduce the Defendants' statements and citations to the record defeats the purpose of my individual practice, which is designed to prevent the Court from having to go back and forth between the two Rule 56.1 Statements.

Defendant is a limited liability company existing under the laws of Connecticut. (*Id.* ¶ 5.) The Edge-on-Hudson Project is a construction project through the Town of Mount Pleasant ("Town") Industrial Development Agency ("Agency") intended to redevelop the former General Motors North Tarrytown Assembly Plant located at 199 Beekman Avenue in the Village of Sleepy Hollow within the Town (the "Project"). (*Id.* ¶ 6.) Requests for bids for the Project were extended in multiple phases. (*Id.* ¶ 7.) The request for bid for the preliminary phase – the site preparation and demolition phase ("Demolition Phase") – was issued by Lighthouse Landing Communities, LLC, the site owner and agent for the Agency, on May 2, 2016. (*Id.* ¶ 8; Doc. 31 ("Goldberg Decl.") Ex. B at 5.) AMEC Construction, LLC ("AMEC Construction") bid on and won the contract for the Demolition Phase. (P's 56.1 Resp. ¶ 9.)

On July 21, 2016, AMEC Construction entered into a contract for the Demolition Phase with Lighthouse Landing Communities, LLC. (*Id.* ¶ 10.) On or about July 25, 2016, AMEC Construction entered into a subcontractor agreement with Defendant to perform work on the Project. (*Id.* ¶ 11.) On August 26, 2016, Defendant entered into a Project Specific Agreement with Plaintiff concerning the work performed by Defendant at the Project. (*Id.* ¶ 12; Doc. 12 ("AC") Ex. A ("PSA").) The PSA provided that Plaintiff was to be the "[s]ole and exclusive collective bargaining agent for all [d]rivers employed [by] the [Defendant] in connection with work performed by the [Defendant] [on the Project], including all on-site trucking and all deliveries to and from the job site." (PSA Art. 1(1).) The PSA incorporated by reference the Local 456 Heavy Construction 2014-2017 Agreement, a collective bargaining agreement

between Plaintiff, two building contractor associations, and independent contractors. (*Id.* Art. 2(1); AC Ex. B ("Heavy Construction Agreement").)[3] The PSA provided:

> [Defendant] and [Plaintiff] agree that the terms and conditions of employment of all [e]mployees subject to this Agreement shall be the same terms and conditions as those set forth in the [Heavy Construction Agreement]. [Defendant] and [Plaintiff] agree to adhere to and abide by the terms of that contract and any successor [a]greements thereto.

(PSA Art. 2(1).) The PSA also contained a durational clause, which stated: "This Agreement, when signed, shall become effective immediately and shall remain in full force and effect through the conclusion of [Defendant's] work at the [P]roject." (*Id.* Art. 3(1).)

On September 19, 2016, the request for bid concerning the next phase – site work and utilities ("Phase 1") – was issued. (P's 56.1 Resp. ¶ 17.) The contract for Phase 1 was bid on and won by AMEC Construction. (*Id.* ¶ 18.) On February 6, 2017, AMEC Construction entered into a second contract with Lighthouse Landing Communities, LLC for Phase 1. (*Id.* ¶ 19.) By letter of the same date, AMEC Construction was provided with a notice to proceed with all Phase 1 contract work. (*Id.* ¶ 20.)

On or about April 12, 2017, Defendant's manager Steve Scherrer informed Union Vice President Cassanelli about impending layoffs. (*Id.* ¶ 25; *see* AC ¶ 13.) Defendant claims that the

---

[3] The PSA refers to "the Local 456 Heavy Highway 2014-2017 Agreement." (PSA at 1.). Plaintiff alleges in the AC that the reference to "Highway" was a mistake and that the relevant agreement is the Local 456 Heavy Construction Agreement. (AC ¶ 11 n.1.) Defendant accepts that fact for purposes of its motion to dismiss, (*see* Doc. 32 at 1-2), but seems to half-heartedly dispute it for purposes of Plaintiff's motion to compel, (*see* Doc. 34 at 3). On this record, however, there is no genuine dispute of material fact that the agreement intended to be incorporated was the Heavy Construction Agreement. Plaintiff has provided the declaration of Dominick Cassanelli, Jr., its Vice President, who avers that the reference the "Heavy Highway Agreement" was an error and that there is no such agreement. (Doc. 37-1 ("Cassanelli Decl.") ¶ 8.) He further provides email correspondence in which, in connection with the negotiation over the PSA, he provided a copy of the Heavy Construction Agreement to Defendant's President. (*Id.* Ex. A; *see* Cassanelli Decl. ¶ 3.)

layoffs were prompted by the completion of the Demolition Phase on April 11, 2017, (P's 56.1 Resp. ¶ 25), but Plaintiff claims that Scherrer said that Defendant was replacing Union employees with non-union employees in order to "be more competitive," (AC ¶ 13). Thereafter, Defendant laid off the Union's employees. (P's 56.1 Resp. ¶ 26.)

Defendant claims that AMEC Construction did not enter a subcontract with Defendant for the Phase 1 work; the Demolition Phase of the Project was concluded on April 11, 2017; and AMEC Construction, not Defendant, performed all work after that date. (*Id.* ¶¶ 21-23; Doc. 35 ("Mazzola Decl.") ¶¶ 17-19.) Plaintiff disputes that the work on the Demolition phase was completed on April 11, 2017, claiming that for weeks after April 11, 2017, non-union drivers were observed performing the same work Plaintiff's members had done. (P's 56.1 Resp. ¶ 21; Doc. 37-6 ("Horowitz Decl.") ¶¶ 1, 9-10, 12.) Plaintiff also argues that even if all work performed on Phase 1 of the Project was completed by AMEC Construction, AMEC Construction and AMEC Commercial constitute a double-breasted entity under Article XVIII of the Heavy Construction Agreement, and thus AMEC Construction is bound by the PSA and Heavy Construction Agreement for any covered work performed after April 11, 2017. (P's 56.1 Resp. ¶¶ 21, 23-24.)

The Heavy Construction Agreement contains a grievance procedure which states, in part: "All grievances or disputes involving any controversy, dispute or misunderstanding arising as to the meaning, application or observance of any provision of this Agreement shall be handled in the manner hereinafter set forth." (Heavy Construction Agreement Art. XXXI(1)(a).) The Heavy Construction Agreement then lists a series of steps for dispute resolution, including subsection (1)(g), which contains an arbitration clause:

> In the event the parties cannot agree on the selection of a neutral umpire the matter shall be referred for final disposition to the American Arbitration Association for

5

> the appointment of an arbitrator who shall have full authority to hear and resolve the dispute in accordance with the Rules and Regulations of the American Arbitration Association.

(*Id.* Art. XXXI(1)(g).) On April 21, 2017, Plaintiff filed a grievance with Defendant claiming that Defendant utilized non-bargaining-unit employees to perform bargaining-unit work beginning on April 12, 2017. (*Id.* ¶ 27.) On July 21, 2017, Plaintiff told Defendant that it was referring the dispute to the American Arbitration Association for arbitration. (*Id.* ¶ 28.) On November 17, 2017, Defendant told Plaintiff that it was not agreeing to arbitrate Plaintiff's grievance. (*Id.* ¶ 29.)

### B. Procedural History

On January 31, 2018, Plaintiff filed its complaint against Defendant ("AMEC Construction, LLC d/b/a AMEC Commercial") in this Court. (Doc. 1.) On March 27, 2018, Defendant requested a pre-motion conference to discuss its anticipated motion to dismiss the complaint. (Doc. 10.) The next day, Plaintiff filed an amended complaint against AMEC Commercial LLC, with five attached exhibits: (1) the PSA; (2) the Heavy Construction Agreement; (3) Plaintiff's grievance dated April 21, 2017, (AC Ex. C); (4) an email exchange between Defendant's President Mazzola and Union Vice-President Cassanelli dated July 21 and 30, 2017, (*id.* Ex. D); and (5) a screenshot of a text message dated November 17, 2017, between "Michelle" and another user who is not made clear in the exhibit, (*id.* Ex. E), but who Plaintiff represents is Cassanelli, (*id.* ¶ 21). The first claim in the AC sought to compel arbitration, and the second claim, advanced in the alternative in case the Court did not compel arbitration, was for breach of contract. (AC ¶¶ 25-33.) By letter dated May 14, 2018, Defendant again requested a pre-motion conference to discuss its motion to dismiss. (Doc. 23.) Plaintiff in its response

indicated that it wished to cross-move to compel arbitration. (Doc. 25.) The Court held the pre-motion conference on June 11, 2018. (Minute Entry dated June 11, 2018.)

In connection with its motion to dismiss, Defendant filed a memorandum of law, (Doc. 32 ("D's Mem.")), and a declaration of counsel, (Goldberg Decl.), with accompanying exhibits: (1) Plaintiff's AC; (2) bid documents for the Demolition Phase contract for the Project dated May 2, 2016, (*id.* Ex. B); (3) bid documents for Phase 1 for the Project, dated September 9, 2016, (*id.* Ex. C); (4) the construction contract between AMEC Construction and Light House Landing Communities, LLC for the Demolition Phase contract for the Project, dated July 20 and 21, 2016; (*id.* Ex. D at 13); and (5) the construction contract between AMEC Construction and Light House Landing Communities for Phase 1, dated February 3 and 6, 2017, (*id.* Ex. E at 13). Plaintiff filed a memorandum of law in support of its cross-motion to compel arbitration and in opposition to Defendant's motion to dismiss. (Doc. 33-1 ("P's Mem.").) Defendant filed a memorandum of law in opposition to the motion to compel arbitration and in further support of its motion to dismiss, (Doc. 34), its Local 56.1 Statement, (Doc. 36), and the Mazzola Declaration, (Mazzola Decl.), and its accompanying exhibit, (Doc. 35-1). Plaintiff filed a reply memorandum in further support of its cross-motion to compel arbitration, (Doc. 37), its Local Rule 56.1 Response, (P's 56.1 Resp.), the Cassanelli Declaration and its accompanying exhibits, (Cassanelli Decl.), and the Horowitz Declaration, (Horowitz Decl.).

## II. <u>LEGAL STANDARD</u>

"In the context of motions to compel arbitration, . . . the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

7

law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters

8

stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

Here, the Court "must determine whether there is an issue of fact as to the making of the agreement for arbitration." *Air China Ltd. v. Li*, No. 07-CV-11128, 2008 WL 754450, at *1 (S.D.N.Y. Mar. 17, 2008) (internal quotation marks omitted). All inferences are drawn in Defendant's favor. *See, e.g.*, *Russell v. Mimeo, Inc.*, No. 08-CV-5354, 2008 WL 6559743, at *1 (S.D.N.Y. Oct. 29, 2008) (where a motion to compel arbitration is opposed on the ground that the parties did not agree to arbitrate, the court "should give the opposing party the benefit of all reasonable doubts and inferences that may arise") (internal quotation marks omitted). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun*, 316 F.3d at 175. The party seeking to compel arbitration bears the burden of showing that a valid arbitration agreement exists. *Russell*, 2008 WL 6559743, at *1.

### III. PLAINTIFF'S MOTION TO COMPEL ARBITRATION

#### A. Plaintiff's Grievance Is Arbitrable

Plaintiff argues that Plaintiff's grievance is subject to arbitration because the PSA incorporated the Heavy Construction Agreement, which contains an arbitration clause. (P's Mem. at 5-8.) "In deciding whether a dispute is arbitrable, [the Court] must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d

9

391, 394 (2d Cir. 2015) (internal quotation marks omitted). There is no serious dispute that the PSA incorporates the Heavy Construction Agreement and that the arbitration clause in the Heavy Construction Agreement is valid. (*See* PSA Art. 2(1); *see also supra* note 3.) Thus, the inquiry turns on whether Plaintiff's grievance falls within the scope of the arbitration agreement. (D's Mem. at 7-10.)

"As an initial matter, an arbitration clause must be construed as either broad or narrow." *Doctor's Assocs., Inc. v. Melton*, No. 01-CV-1842, 2001 WL 34150394, at *2 (D. Conn. Nov. 30, 2001). "Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (internal quotation marks omitted).

> In accordance with the strong federal policy in favor of arbitration, the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (internal quotation marks and citation omitted).

"[F]ederal policy requires courts to construe arbitration clauses as broadly as possible." *Rollins v. Goldman Sachs & Co. LLC*, No. 18-CV-7162, 2019 WL 2754635, at *5 (S.D.N.Y. July 2, 2019) (internal quotation marks and alteration omitted). "Because a collective bargaining agreement is not an ordinary contract, when there is an arbitration clause in a CBA, doubts about scope should be resolved in favor of coverage." *Goodrich Pump & Engine Control Sys., Inc. v. UAW & Amalgamated Local 405*, 723 F. App'x 67, 69 (2d Cir. 2018) (summary order) (internal quotation marks, alterations, and citation omitted). "So long as the arbitration clause is 'broad'

and not explicitly limited to certain matters, it should be read to cover every dispute that it does not explicitly exclude." *Id.* (citing *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 209 (1991)). An arbitration clause that includes the phrase "any claim or controversy arising out of or relating to the agreement" is "the paradigm of a broad clause." *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (internal quotation marks and alteration omitted).

The arbitration clause at issue here is broad. The Heavy Construction Agreement contains an arbitration clause that applies to "[a]ll grievances or disputes involving any controversy, dispute or misunderstanding arising as to the meaning, application or observance of any provision of this Agreement." (Heavy Construction Agreement Art. XXXI(1)(a); *id.* Art. XXXI(1)(g).) *See, e.g.*, *Holick*, 802 F.3d at 394 (affirming district court's conclusion that an arbitration clause applying to "[a]ll claims, disputes, or controversies arising out of, or in relation to this document" was broad) (alteration in original). Indeed, the arbitration clause here closely resembles the type of arbitration clause that the Second Circuit has described as "the paradigm of a broad clause." *Collins & Aikman Prods. Co.*, 58 F.3d at 20; *see Keyes v. Ayco Co., L.P.*, No. 17-CV-955, 2018 WL 6674292, at *7 (N.D.N.Y. Dec. 19, 2018) ("Courts have consistently held that language such as 'arising from' an agreement exemplifies a broad arbitration clause.") (internal quotation marks and alteration omitted). Because the arbitration clause here is broad, Plaintiff's grievance is presumptively arbitrable. *See Keyes*, 2018 WL 6674292, at *7.

Defendant does not contest that the arbitration clause is "broad" but calls it "limited." (D's Mem. at 8.) Defendant argues that Plaintiff's grievance concerns an alleged violation of the PSA, not the Heavy Construction Agreement, and thus does not arise under the broad arbitration clause of the Heavy Construction Agreement. (*See id.* at 9-10.) Relying on *Rochdale Village*,

11

*Inc. v. Public Service Employees Union*, 605 F.2d 1290 (2d Cir. 1979),[4] Defendant asks that I construe the language from the Heavy Construction Agreement which says the parties must arbitrate "any provision of *this Agreement*" to mean that only grievances or disputes that arise under the Heavy Construction Agreement, and not the PSA, are arbitrable. (D's Mem. at 8-10.) In other words, Defendant contends, the PSA is collateral to the Heavy Construction Agreement and therefore outside the reach of the arbitration clause. (*Id.*)

I am not persuaded. First, Defendant is incorrect that Plaintiff's grievance pertains solely to a violation of the PSA. Plaintiff's grievance asserts that since April 12, 2017, "[Defendant] Utilized Non-Bargaining Unit employees to perform Bargaining Unit Work as stated in the . . . Heavy Construction Agreement," in violation of several Articles of the Heavy Construction Agreement, and that the remedy should be "back pay including benefits as stated in the [Heavy Construction Agreement]." (AC Ex. C.) Clearly, Plaintiff's grievance seeks redress and remedies for violations of the Heavy Construction Agreement, and falls under the broad umbrella of "[a]ll grievances or disputes involving any controversy, dispute or misunderstanding arising as to the meaning, application or observance of any provision of [the Heavy Construction Agreement]." (Heavy Construction Agreement XXXI(1)(a).) Indeed, Plaintiff's grievance

---

[4] Defendant's reliance on *Rochdale* is misplaced. The agreement that the Second Circuit found to be collateral to the collective bargaining agreement in that case does not bear any resemblance to the PSA in this case. In *Rochdale*, the collateral "agreement" consisted of correspondence and representations between the parties indicating that both sides believed the collective bargaining agreement would terminate on October 31. *Rochdale*, 605 F.2d at 1296. Concluding that it was "possible" that such correspondence and representations constituted a side agreement, the court found that any such side agreement was collateral to the collective bargaining agreement such that disputes "as to whether the parties entered into a side agreement or as to what the terms of such a side agreement were" did not arise under the collective bargaining agreement. *Id.* at 1296-97. Here, the PSA is a binding contract that incorporates the Heavy Construction Agreement containing the arbitration clause. Accordingly, I do not find Defendant's heavy reliance on *Rochdale* convincing.

12

seems to be exactly the type of "grievance[] or dispute[] involving . . . [the Heavy Construction Agreement]" that the parties agreed to arbitrate. (*See id.*)

But even if Defendant is correct that the underlying grievance raises only a violation of the PSA, the grievance would still fall within the scope of the parties' arbitration clause. The Second Circuit has made clear that an arbitration clause from one agreement (like the Heavy Construction Agreement) that is incorporated by reference into a later agreement (like the PSA) covers disputes arising under the later agreement even if the arbitration clause references only the original agreement. *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venez.*, 991 F.2d 42, 48 (2d Cir. 1993). In *Progressive*, the Second Circuit rejected an argument similar to Defendant's – that the arbitration clause applied only to the earlier agreement containing it, not to the later agreement incorporating the earlier agreement – describing the argument as "plainly inconsistent with prior case law in which we have applied arbitration clauses using similar language to disputes arising out of other agreements into which they have been incorporated by reference." *Id.* at 48-49. In a footnote, the Second Circuit explained why an incorporated arbitration clause containing what Defendant describes as "limit[ing]" language such as "this agreement" covers disputes arising under the incorporating agreement:

> Were we to accept [Defendant's] position, it would be almost impossible to incorporate any arbitration clause into a second agreement. A standard clause such as "All disputes arising out of this agreement shall be arbitrated" could not be incorporated because "this agreement" would be held to refer only to the original agreement containing the clause.

*Id.* at 48 n.9.[5] Thus, the arbitration clause in this case covers disputes between the parties arising under either the Heavy Construction Agreement or the PSA. *See Pitta v. Hotel Ass'n of N.Y.C.,*

---

[5] Defendant's only effort to distinguish *Progressive* is its argument that in that case, the later agreement incorporated the earlier one by saying the latter was "subject to" the former, *see* 991 F.2d at 46, whereas there is "no such similar language" in the PSA. (Doc. 34 at 8.) Defendant

13

*Inc.*, 806 F.2d 419, 422 (2d Cir. 1986) ("[W]here agreements without arbitration clauses supplement an earlier 'umbrella' agreement containing such a clause, that clause applies to disputes arising under the later agreements.").

"[I]n the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (Brennan, J., concurring) (internal quotation marks and alteration omitted). The record contains no such evidence, or any other basis to conclude with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *WorldCrisa Corp.*, 129 F.3d at 74 (internal quotation marks omitted). I will therefore follow controlling law which instructs that when a court is faced with a broad arbitration clause, "it should be read to cover every dispute that it does not explicitly exclude." *Goodrich Pump & Engine Control Sys., Inc.*, 723 F. App'x at 69. The instant dispute is therefore arbitrable.

### B. Defendant's Remaining Arguments Should be Decided by an Arbitrator

Defendant also opposes arbitration on the grounds that the PSA expired prior to the dispute arising. (D's Mem. at 10-15.) "If the arbitration clause is broad, the question of whether the CBA has been terminated will be for the arbitrator to decide if there is 'at least a colorable claim under the contract that the contract has not terminated.'" *Tile Setters & Tile Finishers Union, Local Union No. 7 v. Speedwell Design/BFK Enter., LLC*, No. 06-CV-5211, 2009 WL 922021, at *8 (E.D.N.Y. Mar. 31, 2009) (quoting *Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 886 (2d Cir. 1982)); *see Local Union No. 1 of the United Ass'n of Journeymen ex. rel.*

---

provides no reason why language like "subject to" is required or why it would not suffice to say, as the PSA does, that the parties "agree to adhere to and abide by the terms of [the Heavy Construction Agreement]." (PSA Art. 2(1).)

14

*Apuzzo v. P.A.C. Heating, Inc.*, No. 16-CV-547, 2017 WL 1133346, at *3 (E.D.N.Y. Mar. 24, 2017) ("[S]o long as there is a broad arbitration clause and at least a colorable claim under the contract that the contract has not terminated, then the issue of termination is for the arbitrator.") (alterations and internal quotation marks omitted). Here, there is at least such a colorable claim. The duration clause in the PSA does not indicate that it will expire on a date certain, but that it will remain in effect "through the conclusion of the [Defendant's] work at the [P]roject." (PSA Art. 3(1).) Defendant contends that its work at the Project ended on April 11, 2017, but Plaintiff has provided the declaration of one of its employees who said he observed the same work he had done at the Project continuing beyond that date, (*see* Horowitz Decl. ¶¶ 9-11), as well as the declaration of its Vice President that Defendant said it was laying off Union workers to save money, not because Defendant's work had ended, (*see* Cassanelli Decl. ¶ 11). Therefore, an arbitrator must decide the factual issue as to whether the PSA had expired at the time Plaintiff's grievance arose.[6]

---

[6] Further, "[w]here the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *See Louis Dreyfus Negoce S.A.*, 252 F.3d at 224 (internal quotation marks omitted). Thus, even if the PSA were considered to be collateral, arbitration would still be appropriate if Plaintiff's claim required construction of the terms of the Heavy Construction Agreement. The termination issue presents such a claim. Defendant concedes that AMEC Construction continued working on the Project after April 11, 2017, (Doc. 36 ¶ 19), and Plaintiff has presented evidence that AMEC Construction and AMEC Commercial have the same ownership and management, (Cassanelli Decl. ¶ 13). Plaintiff claims, among other things, that AMEC Construction and AMEC Commercial constitute a double-breasted shop within the meaning of Article XVIII of the Heavy Construction Agreement, and that the former's continued work on the Project means that it must abide by the latter's obligations under the PSA. (Doc. 33-1 at 10-11.) Thus, the issue of whether the PSA terminated implicates the parties' rights and obligations under the Heavy Construction Agreement, and thus arbitration would be appropriate even if the PSA were collateral (which, as discussed above, it is not).

15

## IV. DEFENDANT'S MOTION TO DISMISS

The Court denies Defendant's motion to dismiss without prejudice as moot. *See, e.g., Bank of Am., N.A. v. Diamond State Ins. Co.*, No. 01-CV-645, 2002 WL 31720328, at *4 (S.D.N.Y. Dec. 4, 2002); *Drennen v. Certain Underwriters at Lloyd's of London (In re Residential Capital, LLC)*, 563 B.R. 756, 766 (Bankr. S.D.N.Y. 2016).

## V. CONCLUSION

For the reasons set forth above, Plaintiff's motion to compel arbitration is GRANTED and Defendant's motion to dismiss is DENIED without prejudice as moot. While the Second Circuit has held that "the text, structure, and underlying policy of the [Federal Arbitration Act] mandate a stay of proceedings when all of the claims in an action have been referred to arbitration *and a stay requested*," *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) (emphasis added), neither party here has requested a stay. Accordingly, a stay is not required. *See Benzemann v. Citibank N.A.*, 622 F. App'x 16, 18 (2d Cir. 2015) (summary order) (absent request, no requirement that district court stay rather than enter judgment against plaintiff after granting motion to compel arbitration); *Perez v. Ruby Tuesday, Inc.*, No. 16-CV-795, 2019 WL 355637, at *4 (N.D.N.Y. Jan. 28, 2019) (same); *Valdez-Mendoza v. Jovani Fashion Ltd.*, No. 15-CV-7261, 2017 WL 519230, at *4 (E.D.N.Y. Feb. 8, 2017) (same). *But see Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 186 n.15 (S.D.N.Y. 2018) ("Since *Katz*, most of the district courts in our Circuit have hesitated to dismiss arbitrable claims, even where neither side has expressly requested a stay.") (collecting cases). The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 30, 33), enter judgment in favor of Plaintiff on its first claim, and close this case.

16

**SO ORDERED.**

Dated: July 30, 2019
      White Plains, New York

                                          _____
                                            CATHY SEIBEL, U.S.D.J.